Our final case of the day is United Bank v. Buckingham. Mr. Scroll, good to have you on behalf of the appellant. This is a case where a trial court has committed reversible error because of improper application of the unclean hands doctrine and using it to bar a litigant bank from bringing an action that was not tied in any way to inequitable conduct and treating it as an absolute bar in the face of a statute, a Maryland statute, which specifically would seem to contradict that result. In addressing the unclean hands issue, I think the most striking thing about the exercise of that The trial judge in the state court, in the Maryland circuit court, had heard all the evidence, had seen the demeanor of the witnesses, had everything in front of him, and when he issued his decision and when he ruled invalidating the bank's second amendment because of his view that the bank should have known of the incompetence of the signer, notwithstanding that, notwithstanding having heard all of that, he went out of his way to make sure that the funds at issue were not automatically given to the Buckinghams. They were put in the registry of the court because before any of that was decided, the bank had filed this counterclaim and the court stated on the record there are issues about the legitimacy of these trusts that were used to, as a result of that, the recipients of the insurance proceeds. So the trial judge in the state court anticipated that this was going to go forward. It didn't go forward as a counterclaim in the state court for a number of reasons, but in Maryland it actually puts a pretty heavy burden on the party asking for leave to amend to prove the absence of prejudice to the other side. I think it's easier to understand our position if you think that if this had gone forward as a counterclaim, it would be equivalent to a judge saying, I want to hear the claim of one side first, and then deciding after hearing that, that he's so put off by what he's seen there that he's not even going to allow it. He's going to allow the other side to put on their case. But the court had made some, that is the Maryland Circuit Court, made some pretty damning factual findings from your point of view, did it not? That John's signature had been forged on the second forbearance agreement that counsel for the bank had specifically advised the bank to get a medical examination before allowing John to sign the forbearance agreement. These are factual findings that are part of the record. So how could the court have deviated from that? They were part of the court's judgment in entering the declaratory judgment on the plaintiff's motion. First, Your Honor, thank you. The important fact that gets how confusing here, you mentioned the forgery. There are actually two documents. There was a second amended forbearance agreement, and there was an assignment of the insurance. Right, and the court was referring, I think in its factual finding, was it not to the second forbearance agreement itself? The second forbearance agreement, there was a signature that was the incompetent John's signature was valid, and the forgery had to do with a separate document, an assignment document that Tom Buckingham committed the forgery. The bank was not implicated in that in any manner. And I think one of the things we point out in our papers is that the trial court and the federal court seemed to have got that confused and was trying to paint the bank with a brush that it had committed an engagement forgery. But the court did, and I don't mean to cut you off, Your Honor, but it seems to me, and this is what's concerning me about your position, the circuit court in Montgomery County was saying that the bank knew well before this agreement was executed, that is the second forbearance agreement, that John was suffering from dementia. Your predecessor bank knew that. How do you get around that? One of the nuances, and I don't want to be staking out my claim based on trying to defend the actions of a loan officer or judgment that was made, but there is a fine distinction between someone who has dementia and someone who is legally incompetent to sign a document. And there was a lot of testimony about that and what the gradations of that were. Wasn't the circuit court's finding advanced dementia? Ultimately, yes. And the point that I commenced with is that notwithstanding having made these factual findings and heard everything about the case, this judge at the end of the day said, I expect and anticipate and making it possible for this additional claim of the bank having to do with the wrongful, alleged wrongful conduct of David Buckingham, that should go forward. And I'm going to keep this money here until that's been resolved. So the claims that the bank is asserting now, wouldn't your client have had those claims had it never engaged in the second forbearance agreement? Precisely. And this is where we think it goes beyond simply trying to protect the integrity of the federal court and into punishing the bank. Because the bank lent over $5 million to this company that had thrived for a long time. They went in there with their rights as an unsecured creditor and they were scrambling around and they were dealing with the president of the company, Tom Buckingham. They weren't trying to enforce this on an old man who didn't know what was going on. Tom Buckingham was acting as a president and was advocating for this loan. There's a key email between David Buckingham and Tom Buckingham at page 877 of the joint appendix where it's clear that there's a conflict within the Buckingham family. David Buckingham didn't like the fact that Tom was trying to deal with the bank and to keep the company alive by continuing to work with the bank. And so it wasn't so much that the bank was just trying to force this on an old man who didn't know any better. It was dealing with Tom Buckingham and the bank's representative worked this out and the bank advanced an additional $750,000. But the point is that this goes beyond to the point of punishing the bank because the district court's ruling is no different than if the bank came in after having been ruled against in the state court and said, we want to try to get a judgment as an unsecured creditor against the company at this point. And the district court saying, I'm not even going to let you come into my court and get a judgment because I'm so offended by the actions that the state court found that I'm going to preclude you from exercising your rights as an unsecured creditor. And we think that goes beyond trying to protect the integrity of the court into punishing the bank. There's no – the decisions that the judge relies upon, the Mona decision, the Turner decision, involve extraordinarily different factual setting where someone had actually taken contrary positions in the court, had in the case of Mona, he either lied in one proceeding or he was lying in the other proceeding. And in Turner, likewise, there was this egregious conduct that had occurred and somebody coming into the court and saying, I'm not getting my fair share of the ill-gotten gains that my husband got from this fraudulent scheme. There's nothing of that ill in this case. It was a bad judgment on behalf of an account officer. And it's striking that the state court judge goes out of his way to say, I'm not casting aspersions on Mr. Anderson, complimented counsel. The bank conducted itself fairly and now seeks to come to the federal court and say, look at all these other actions that were going on here. Just moving over to the fraudulent conveyance count, because we have to prevail on the unclean hands and we have to prevail on another issue. The ruling that the court made was that under no circumstances can there be a fraudulent conveyance by changing the beneficiary of the life insurance policies, even if it's done intentionally to hinder the layer of fraud creditors. And that just absolutely flies in the face of Maryland Statute 16111, which provides, it's entitled proceeds exempt from creditors, but it deals generally with the relationship between life insurance beneficiaries and creditors. The Part D of that says explicitly, a change of beneficiary assignment or other transfer is valid except for transfer with actual intent to hinder, delay, or defraud creditors. Now, Mr. Buckingham would say, well, we can explain that, that it just has to do with secure creditors because the prior section has to do with that. But it doesn't limit it at all just to secure creditors, and it is obvious that but for the conduct that took place here, the bank as an unsecured creditor would have had the right to claim as a creditor of the corporation that would have been the default beneficiary of these insurance policies. Mr. Buckingham came in and took these actions, created trusts standing in his role as a guardian, transferred the monies to himself as the trustee of these trusts, and the money at the end of the day went to the Buckingham family and not to the creditor, millions of dollars that would have gone to the corporation as the default backup beneficiary if David had not intervened. And there was evidence that we wanted to present to the court in the form of that email where he's directly arguing with his brother saying, if we don't take this action, if I don't do something, the creditors are going to get the money, not mom and dad. And we have that and plus innumerable badges of fraud where they're on both sides of the transaction. So the notion that the trial judge did not even consider, did not discuss anywhere in his opinion in ruling that as a matter of law, there cannot be a fraudulent conveyance, intentional fraudulent conveyance by changing- You're talking about the trial judge in the district court? In the district court, yes. And so we think it's air for him to have ruled in this manner without even considering the Maryland code section, which deals directly with this and seems to suggest that, in fact, it can be. Isn't another issue you raised that he assumed that the guardian had the right to change the beneficiaries, which is an issue without evaluating that issue? Exactly, because- Well, doesn't the guardianship statute allow the guardian to do that? It does not, Your Honor. The guardianship statute makes no mention of that capability. And even though they're specifying other types of things that a guardian can do with respect to insurance policies, all those- Well, the guardian can sell the policy, is that correct? The guardian could arguably sell the policy, but in this instance, we're talking about the change of beneficiaries and the powers that are given to the guardian in the statute are ones that would impact on the well-being of the ward while the ward is alive. By definition, a change in insurance beneficiaries only comes into play when the ward has died. And so it's beyond the types of things that would normally be done by a guardian. We cited innumerable cases where the courts, for years and years, have said that this is not within the power of a guardian. And they explained that why would let a guardian override the wishes of the incompetent as to who the beneficiary would be when they were perfectly competent? We're not going to let the guardian come in and change that without getting some authority from the court. The legislature listed many different things that can be done in the context of a life insurance policy but didn't mention that. Instead, they want to rely on that inference being made from the statute. We cite to the court in our papers a treatise that was written at the time in Maryland saying that that was not, it doesn't mention that as one of the things that was being liberalized by the change in the code when that was enacted. Thank you. You've saved some time. Yes. Mr. Claxton. Nice to have you here, Mr. Claxton. Thank you. Thank you, Your Honor. With the court's indulgence, I'm going to take one second here and bring up some water because I do have a problem when I talk. Go right ahead. May it please the court, Charles R. Claxton, on behalf of David Buckingham. The other Buckinghams are not here by choice. Are you representing them all or are you just representing one? I just represent David, but they're perfectly comfortable. Well, what's the status of the rest of them then? They got, are they throwing it in? Not currently. No? I mean, I'm serious. Oh, no. Susan's lawyers have waived any argument time in my favor, and they signed on the briefs. Of course, they were involved in the briefing. Richard's lawyers, well, Richard has no economic interest anymore because of a personal bankruptcy situation that he encountered during the course of this time period. And he doesn't want to spend money litigating something that's basically not of any economic impact to him whatsoever, as it turned out. I'm sorry. Could you keep your voice up? It's a little hard to hear. Yes. Richard had declared a bankruptcy during the course of the history of this case. And as a result of the way that turned out, he has no economic interest. Were there three of them? There were three. And Richard's in bankruptcy. Yes. You represent? David. David. And Susan is throwing in with you. Yes. Susan's on the papers. Her lawyers are on the papers. They participated in the briefing, but they did not come to argue and deferred that to me. And they take the same position as you do? Absolutely, 100%. Okay. Altogether, Your Honor. And I think Rick does, too. He just doesn't care. Your Honor, as to the application of the unclean hands doctrine, I think that Mr. Shroll understandably has kind of downplayed what the trial court in Montgomery County found after hearing all the evidence and hearing from the witnesses. He didn't find that the bank should have known. He found that the bank had actual knowledge, and the evidence for that was ample, including the fact that the bank itself no longer would deal, stopped communicating with John, that the individual that the bank actually inserted into the business at Sun Control was privy to medical reports that gave John only six months to live. Turned out to be wrong. But said he had advanced dementia, only six months to live. And this was all discussed at board meetings on the problem on committee meetings. They developed this strategy to go after the insurance. It's right there. We cite it in the record. Without contesting the trial court's finding on those issues, I hear you on that. But isn't the result of the district court's application of the unclean hands doctrine is that the effect was not only that the bank lost the ability to exercise rights as a secured creditor into the insurance proceeds, which is where the unclean hands conduct took place. But the district court said, not only do you not get the benefit of your inequitable unclean hands conduct, I'm going back to the position you had before you even engaged in it, and I'm eliminating the rights you had as an unsecured creditor. So that the bank, after lending millions of dollars, goes away with nothing. It seems like he's gone beyond prohibiting the bank from benefiting from its unclean hands conduct, which I understand, to not only that, but not getting the benefit of the rights it had before it engaged in that conduct. I understand the question, Your Honor, and I think that there's certainly something of that effect, and I think there's almost always going to be something of that effect within the unclean hands doctrines. The only reason the unclean hands doctrine is applied is to prevent the court from hearing out an argument from the party seeking some kind of relief, and the court's not even going to hear it. They're denied that opportunity to seek relief. Let Judge Quattle bob. Yeah, I'm sorry. No, please. When he's speaking, you listen. And I want to hear your argument too, so if I talk over you, I apologize. I didn't perceive that, Your Honor. In Mona, the court, I think I'm quoting accurately, says, the issue is not that the plaintiff's hands are dirty, but that he dirties them acquiring the rights that he now asserts. And in this case, the bank's asserting the rights it had as an unsecured creditor that would have existed whether they dirtied their hands or not. The language that you quote from Mona, if I'm not mistaken by memory, is quoting from another case. And in Mona itself, the issue upon which the court fits, in sua sponte, by the way, the court sua sponte invoked unclean hands on the basis of the fact that in totally unrelated proceeding, the plaintiff, Mr. Mona, had told the federal government, and I'm not sure it was a proceeding, just some tax return probably, had told the federal government, I am deducting some business costs here because I personally guaranteed money that was advanced to a related company and was lost. And I'm writing it off. And the court said because of that, and the contrary position he was taking in front of the judge, that is that I'm not liable for that debt and therefore I'm entitled to a full share of these dividends from the company, totally unrelated. The prior conduct was absolutely 180 degrees from what he was now advocating, but it wasn't just a finding of, oh, you're impeached, I don't believe you, or the evidence shows to the contrary. He invoked sua sponte, invoked unclean hands, based on something that was totally separate. Well, it's not totally separate. I'll do it again. No, no, no, it's all right. Let me hear you because you kind of anticipated that it doesn't appear separate. You're right. There were diametrically opposed positions, and one in which either were under oath or under the penalty of perjury. So the plaintiff in that case, I forget the names now, but anyway, he was not allowed by the court in Mona to assert a position that was directly contrary to that, that had been made of a perjury. I get that, but that's not what we have here. It doesn't appear to me. I mean, we have the district court accepting the findings of unclean hands, prohibiting the bank from getting a security interest, taking a secured position as a creditor, which I get. That makes sense. But they've gone beyond that, it appears to me, and say we're reaching back and not even letting you pursue the rights you had before you dirtied them at all. I agree, Your Honor, there is a distinction there. Every one of these cases is factually distinct. And that is, I guess, a testament to human ingenuity, that the ways of being inequitable and unfair and bad are innumerable. And each of these cases is different. Okay, so what is your point then? I'm trying to understand. Are you saying that if the subject matter is the same, it doesn't matter what the nomenclature given to the claim is, if the subject matter of the deceitful or unclean action is the same? And if that's your position, then tell me how you establish a nexus with regard to the John Hancock policy. The John Hancock policy, Your Honor. Where's the nexus there? If you agree, I mean, do you? That's what I'm gleaning from your argument. But you tell me. Are you basing it on the subject matter of the unclean hands rather than the status of the creditor or the nomenclature assigned to the claim, but rather the subject matter? Is this your position or not? It is not just my position, Your Honor. I submit that it's the position of the courts in the state of Maryland, which have decided the cases that we have cited and upon which we've relied and upon which Judge Titus relied when he drew the conclusion that he should. Then if that is your position, what is the nexus to the John Hancock policies which were not part of the second forbearance agreement? The John Hancock policies were not part of the forbearance agreement. So they weren't the subject of the unclean hands? They were not. No, they were not directly implicated in that, Your Honor. Well, how did they get swept into the district court's ruling then? I think the court would have had the option to do what Judge Mona or the judge did in the Mona case, Mona v. Mona Electric, where the judge did not completely close the door on the claim of Mr. Mona and apply the unclean hands doctrine to a portion of the claim. I think that would have been within the judge's discretion to do that. Okay, but what are the unclean hands here with regard to the John Hancock policies? I think that is also within the discretion of the court. Right, but I want a factual answer from you, if you don't mind. What are the unclean hands here of the bank with regard to the John Hancock policies? As for those, they weren't part of the problem that led to the unclean hands finding, Your Honor. Okay, so how did they get swept into the district court's judgment? I think the judge has the discretion, and in that regard, I would point to the Smith v. Cessna case that we also relied upon. It's actually out of the federal court, but not the state, where the plaintiff in that case was injured in an airplane accident. Soon, the manufacturer was seeking lost profits because he was, or lost income because he was injured and was unable to work for some period of time, and it turned out in discovery, they found out that he had not been filing his taxes, and the door was closed. I think the door can be closed entirely. It's within the discretion of the court to close the door to the plaintiff in that kind of situation without trying to carve out areas in which, had they been totally independent, the court might well have entertained the claim. Did the court there prohibit medical damages or just economic damages? Just economic, correct? Your Honor, I don't want to say without being certain. It's been a while since I've read it. Fair enough. But my recollection was that this person who really obviously did lose income was barred from recovering anything based on behaviors that otherwise could have been punished. Let me follow up, if you don't mind, on an issue related to the Hancock policies, following up on Judge Keenan's question. A separate one, though. It looks like in the history of whether fair consideration was obtained in the transfer of those, there was arguments made and evidence presented on both sides of that equation about whether the consideration was fair. And on page 15 of the order, the district court appears to acknowledge or state that there's no authority on this and says, I accept your client's position on that, which may be the right position at the end of the day, but it looks like there's evidence on both sides of that equation. And the district court made a finding between which was the more compelling of the two presentations of evidence. With that, I would disagree, Your Honor. I don't think that's accurately reflected in this voluminous record. I think you can search the record from start to finish, and there is no evidence offered by the bank as to the valuation that the company and the buyer of the trust agreed to let the insurance company tell them what this transfer was worth pursuant to the IRS regulations. But what they said, they pointed to evidence, and that evidence may be more powerful. I'm not suggesting it is or it isn't. But they did point to evidence. The district court acknowledged that the value was closer to $750. That when they got the death benefits, they were $709,000 after the transaction. So you may dispute the evidence and determine that the calculation was made was the better evidence of that. But I think it's, as I read it, there was evidence on the other side. But yeah, I don't believe there was any evidence. But there was a misunderstanding or mischaracterization of the transaction that took place. Sun Control was the owner of the policies. And it had a limited right. It was a split dollar structure, as it's called in the industry, where Sun Control was paying the premiums, although they had stopped. They hadn't past paid the premiums for some years. And upon Mr. Buckingham's death, they would recover first what they had paid in the premiums. That's why it's called split dollar. The money is divided. They would get back the premiums they paid. Everything else went to Mr. Buckingham. And per his direction, it's the beneficiaries. So all they had was a $280,000 interest. They didn't have a $750,000 interest. They didn't have a $1.5 million interest. Mr. Buckingham had the control of everything except the $280,000. And that's all they had to sell. Okay, now did SDS get the $110,000? Absolutely. Okay, so you're saying it's not really $280,000, but it's $170,000? Actually, Your Honor, the valuation that was given by the insurance company, because the parties had no idea how to value this, was deemed by the federal government to be the fair market value of the entire policy. I'm not an actuary. I don't understand this stuff. I looked into it a little bit. I don't know how it works. But basically, as I understand it, we have a situation where you have a valuation that is based on mostly the cash surrender value of a policy. So here, there was no cash surrender. It was negative. These policies were behind. They were overdue. They were collapsing and so forth. So you had almost no value apart from surrender values. The cash surrender values took it negative, and you put all that into whatever calculation the IRS approves, and it comes up with this policy has a value of $110,000. I don't know how they get there. But from our point of view, this argument that, well, it was worth a lot more because when he died, there was going to be almost $1.5 million in benefits. So what? They only had $280,000 to sell. And the company wanted to do it. It was going to lapse, and the company was shutting its doors, going out of business, had no way to pay. They had no interest in anything other than getting a fair price for it to be applied as it should. And so the argument, which your Honor has viewed as being evidence, it's just argument, and it's based on a false understanding of or misunderstanding of the actual transaction, which I think we laid out very clearly both in the district court and in our briefs here. The transaction was totally voluntary between the two parties who didn't know how to value it, who deferred to the insurance company pursuant to federal regulation to come up with a valuation that's used for tax purposes. Didn't John Hancock, though, and I don't mean to cut you off there again, but didn't John Hancock, though, send David the letter? Or am I mistaken on that? I thought John Hancock explained the reduction in the death benefits of the two-party policies, or at least that's what the trial court said as part of its decision. The trial court specifically references it on page 15 of its decision that John Hancock wrote a letter to David setting that 709, 709,000 amount. Is that correct? Oh, that's basically the advance... Okay, I understand. Yes, basically to get the... Mrs. Buckingham, by the way, was alive all this time. And the statute, guardianship statute, provides that the guardian has responsibility not only for the ward, but for the ward's dependents. So that has to be factored into this. So they wanted to get the money, not only the advance payment, not only to get money to take care of Mr. Buckingham, which is terribly expensive, but to support Mrs. Buckingham as well. And it's basically a loan. And so $750,000 of death benefit was reduced to 709,000 when it came to him. Because if you get it early, you're basically treating it as a loan and you have to pay. So it didn't get the full value, but by getting the advance debt benefit payment to take care of the parents. So I guess that's circling back again to the question asked earlier, then is there a dispute in the evidence as to the... There's an argument. There's just an argument. And they want to argue based on a 1943 tax court case, I guess. They're arguing evidence in the letter that Judge Kainan discussed, and they did make an argument on top of it. But, you know, it seems to me you think just because the argument isn't very strong, it somehow isn't worthy of being considered an issue of fact. No, I don't think... Let me put it this way. You can finish. Okay, thank you, Ron. The bank easily, I think, could have come up with evidence to present to the court a contrary evaluation if they thought it would be beneficial to them. All they had to do was to engage an expert actuary, and there are people out there that do this, and maybe they called an actuary who said, that's not right. And they didn't... They could have easily gotten some evidence simply by getting an actuarial assessment that differed from what John Hancock did, if, in fact, it would have differed. Perhaps they asked and they found out it didn't make any difference. But all they came up with by way of argument is to say, well, this million and a half dollars' worth of policies is worth more than 110. Yeah, we agree. From our perspective, it was worth more, too. From Mr. Buckingham and Mrs. Buckingham, who needed to survive on it, yeah, that was valuable and it's worth more than 110 to them. But it's not what fair market value of the policy was from the government's point of view, from a tax point of view, from an actuarial point of view, it's worth a lot less. They had to pay hundreds of thousands of dollars to get these things current, and depending on how long Mr. Buckingham lived, which turned out to be about a year, you had to pay something close to $120,000 a year just in premiums to keep it in effect. So these were heavily burdened policies and the economics of them were such that it was worth a lot more than the face value of the or a lot less, rather, than the face value of the policies themselves. If there are no further questions that you wish to ask. Thank you, Mr. Flaxman. Thank you, Your Honor. Mr. Scroll. With respect to the John Hancock policies, there are several points I'd like to address. The notion that this was a total voluntary exchange is preposterous in the sense that David Buckingham was on both sides. He was insinuating himself on behalf of the corporation as a special agent, took steps to do that, and then on the other side was receiving it as the trustee of the Osprey Trust. So the notion that it was anything resembling an arm's length transaction is just not true. But the other important thing is that the value of the policies is not simply the lesser amount, the 280. At bottom, there was a mention in the earlier argument about common sense. Our argument is predicated on common sense, that if you sell something for 110,000 and there's an immediate benefit to the purchaser of 750, that's not a fair equation. You don't need an expert to come in and say those two things are not reasonably equivalent. Moreover, the entire predicate for this was that he was on his deathbed. And he was expected to die at any time. And therefore, the advance payments were able to be obtained in that context. They went and got an IRS formula that we submit and we argued and we were going to argue to the court had nothing to do with this context where somebody's on their deathbed. We cited to the court a tax court opinion, which in the body of that cited Supreme Court cases, that say just the common sense principle that a policy's value changes. And an IRS formula might be okay taking into account actuarial tables in one context. But if somebody is going and getting advance payments because the person's about to die, then it's a different setting where the value of the policy is essentially its investment value. It's the full value that could be realized because the person's about to die. And is your argument that there's a question of fact as to what the fair value was? Yes, absolutely. And that the idea that we needed to have an expert witness or that there wasn't a factual question about the situation, the context in which it was arising is not the case. Does your analysis, is it affected at all by the fact that Elizabeth and Tom approved the sale as members of the board? Does that factor at all into your analysis? Well, not really. They both voted to approve the sale. The key to the analysis, the constructive for all, is that there was no adequate consideration. What gets lost here, too, is there was not just the 750, but within a year, another 750. So the value ultimately was enormous. And the consideration that was paid to the corporation was simply netted out against the proceeds that went to the purchaser of the policies. It wasn't cash paid up front. It was actually in terms of a loan that was paid out. So on its face, there wasn't an equivalent exchange. And for the court, in a summary judgment context, to say we're going to just accept your version of it without going further, we submit is air. If we agree with you on the Hancock policy, what do we do? Well, I think that it's then a ruling that it's a fraudulent conveyance. And that with that, we're free to pursue our remedies and try to obtain relief against David Buckingham and the others who ultimately received the benefits of that transaction. You're not saying we have to find it's a fraudulent conveyance. You're saying there's a question of fact about whether it is, correct? That's correct. I'd prefer to have you find that it's a fraudulent conveyance. But I think it's a question of fact. If it's a question of fact and we were sent it back, what happened? Who are you representing again? Could you clarify that for us? Represent the bank. No, no, I'm sorry. Yes, I know that. But with regard to the issue of the fair value, is this, and I guess I misstated that. What I meant to say was when you talk about fair value, was the judge concerned about the fact that you didn't present evidence? In other words, if there's a dispute as to fact, but you had an opportunity to present evidence, do you see what I'm saying? Do you still win in terms of it shouldn't have been disposed of on summary judgment? Because while there were other items in the record indicating the existence of a higher value, you had kind of an opportunity to bring it home, I think, by presenting your own evidence evaluation and you didn't do that. So I guess my long-winded way of getting to the questioner, would we be giving you a second bite at the apple that you defaulted on in failing to present that evidence? Your Honor, I think it's not a question of our failing to present evidence. I think it's a question of, and I think that you get into a blurring of the legal argument versus the factual, that we cited a tax court opinion to the court that discusses the common sense evaluation of a policy when somebody's near death. And coming to the conclusion that the actual value of the policy is very near to the total potential value because the person's near death. And that we think it was error for the court to ignore the obvious that $110,000 is not equal to $750,000. $110,000 is not equal to over $1 million, $1.5 million. So you're just saying you didn't need to present that evidence to survive summary judgment. Would you need that evidence to get a judgment in your favor then? I think we don't need an expert witness and I think that Would you have to have a trial? I'm not sure we'd have to have a trial. What happens if we send this back? What happened? I think that the court can find that the judge committed error by simply finding no favor on summary judgment. What happens if at the summary judgment as to the John Hancock policy, we send it back, what happens? I think among other things we question Mr. Hancock, are you going to have a trial? Yes. I don't think you all thought this through. It doesn't seem to me. But if you're right on that one point and it's sent back, what happens then? It sounds to me at least like you may be suggesting here you didn't have to present evidence. It was so obvious. And so that you could simply ask the court to enter a judgment in your favor. But you don't have a number. And if that's the case, there is no dispute in its legal judgments. We're really trying to figure out if you have evidence, that's one thing. If you have an argument, that's different. Our presentation to a court, if we went back, would consist of examining the witnesses, David Buckingham. We sought to get discovery from the lawyer who advised Mr. Buckingham. We would have an insurance company witness coming in and explaining under what circumstances. Explaining to who? Explaining to the court under what circumstances. It would be a bench trial? Yes. A bench trial. So everybody would have to waive their jury rights. You have a bench or jury. I think the argument would be it would be a trial. And if they want one, they get a jury, I suppose. I think this was going to proceed in a bench. I think it was going to be a bench trial. I think that's how we were going to proceed. You were going to have a bench trial. Did everybody agree that they'd waive their jury rights, David? I don't recall, Your Honor. So you all don't know what would happen if we would even ruin your favor. Well, if I may respond. You're over time, for sure. Would you like me to respond? Yes, sir. I want to find out as much as we can. We're trying to get some out. One of the factual questions is with respect to the evidence that the court adopted their formula, under what circumstances is it appropriate to use that formula? Is it appropriate to use when somebody is near death or is that formula really something that's used properly in other contexts? And we think that we'd be able to demonstrate that quite plainly. The tax court decision we cite discusses that concept, that legal principle, and that legal principle would lead to being able to demonstrate to the court that the facts that they purported to present in the form of that IRS formula did not indicate value in this context. You didn't present any of this in terms of assembling the summary judgment record, and so you're saying you don't have to. Is that right? Because it's obvious that there was a great discrepancy in the values presented to the court? We think that it is sufficient based on the great discrepancy, based on the fact that the formula that they use is inappropriate to the circumstance, and based on the decisions and discussions and the rationale of the fact that when a policy's value is at its full value when somebody is near death, which is the whole reason that they were getting the cash advance in the first place. So we think that it is substantially, yes, legal argument based on common sense and based on the reality that the full value of the policy was realizable and was the actual value that was nowhere near the 110. And I would say that as the party challenged in the transaction, we don't have to demonstrate exactly how much it was worth factually. We have to demonstrate that the transaction that did take place was not for adequate consideration. But you wanted to win, didn't you? You wanted a number. Didn't you want to win? We do want to win. But I think what we want to do is set aside that and then be able, we know how much money ultimately went there, and that's what we want the right to be able to pursue. If there's no further questions, I think that's all I have. We'll adjourn court for the day, and we'll come down and re-counsel. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: Robert B. King, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.